UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KISHNA BROWN,

                Plaintiff,                             Case No. 12-14953
                                                             Honorable Thomas L. Ludington

v.

BRADLEY LEWIS, NATHANIEL
KAMP, JASON RICHNAK,
DISPATCHER #1, CITY OF
BAY CITY,

                Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART, DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
DISMISSING CITY OF BAY CITY**

On April 28, 2011, at approximately 8:50 p.m., Robert Surgeson (Surgeson) called 911 from his sister's home located at 305 Marsac Street in Bay City, Michigan. At the time, Surgeson was highly intoxicated. The phone call led Bay City police officers to conduct a felony-traffic stop of Kishna Brown (Brown) after they observed her drive away from the 305 Marsac residence. Brown, the plaintiff in this lawsuit, alleges that three Bay City police officers (Bradley Lewis, Nathaniel Kamp, and Jason Richnak), along with an unnamed dispatcher and the City of Bay City, violated her rights in connection with that traffic stop. Based on the following, the Defendants' motion for summary judgment will be granted in part and denied in part.

**I**

**A**

About two hours before Surgeson called 911—around 7:00 p.m. on April 28—his sister Leslie Surgeson (Leslie) and Brown left the 305 Marsac residence to visit a friend and watch a

movie.  Brown Dep. 121, *attached as* Defs.' Mot. Ex. G, ECF No. 18.  They took Leslie's two-year-old nephew along with them, but left behind Brown's two daughters Kishreana and Teaira, Leslie's son Maurice, and two of Maurice's friends.  Surgeson also stayed behind in the basement of the home.  *Id*. at 115, 122.

Apparently Surgeson drank a fair quantity of alcohol while in the basement, and he decided to call 911.[1]  After Surgeson placed the call, a female dispatcher answered, and he began, "Yea.  Bump and grind goin down.  Bump and grind goin down.  Uh, you gonna, you gonna send 'em or what?"  911 Audio Recording 0:22–0:28, *attached as* Defs.' Mot. Ex. A.  The dispatcher asked, "What do you mean, bump and grind going down?"  *Id*. at 0:30.  Surgeson responded, "You figure it out."  *Id*. at 0:31.  The dispatcher, obviously confused, said "I'm supposed to figure it out?  You're calling me."  *Id*. at 0:32–0:34.

At this point it sounds as if Surgeson hung up the phone, but he didn't.  Instead, he can be heard—apparently walking away from the phone after placing it down, still off the hook—repeating, "Bump and grind goin down here.  Bump and grind goin down here.  Bump and grind goin down here."  *Id*. at 0:37–0:46.  After over thirty seconds of silence on Surgeson's end of the line, he can be heard saying "[inaudible] gotta act like a pervert.  I gotta act like a pervert.  I gotta act like a redneck, cause the police are," *id*. at 1:25–1:32, at which point he was interrupted by a woman[2] who asked, "Why?" *id*. at 1:32.  Surgeson answered, "The police are pumped and hittin this house.  The po-po's are pumped and in here."  *Id*. at 1:35–1:41.  Low talking is audible over the next twenty seconds of the recording.

---

[1] It is not at all clear why Surgeson decided to call 911, but in the words of Sammy Davis, Jr., "Alcohol gives you infinite patience for stupidity."

[2] Noted above, Brown testified that her daughters "Kish and Teaira" were at 305 Marsac along with Leslie's son "Maurice" and a few others (including Surgeson) at the time of Surgeson's call.  Brown Dep. 112–116.  It is not clear who—Kish, Teaira, or someone else—is the woman involved in this conversation.

Around two minutes in Surgeson said, "I'm going to hide.  I'm going to hide.  Hey, [inaudible] don't open the door for these fuckers." *Id*. at 2:03–2:10.  A woman[3] responded, "We will." *Id*. at 2:11.  Surgeson grunted, "Huh?" *id*. at 2:12, and the woman repeated, "We will," *id*. at 2:13.  Surgeson asked, "You're opening the door?" *Id*. at 2:14.  The woman confirmed "Yea." *Id*. at 2:15.  Then Surgeson asked "Why," *id*. at 2:16, but no direct response can be identified.

Surgeson was not done.  Indeed, he was sure that the police were on the way and no one was to grant them entry: "Hey.  The po-po's are coming here.  The po-po's are coming here." *Id*. at 2:20–2:25.  Audibly laughing, the unidentified woman said, "Okay." *Id*. at 2:26.  Surgeson: "They are.  They're on their way.  Straight on their way." *Id*. at 2:28–2:32.  The woman said something inaudible, to which Surgeson responded, "Yea.  Don't open the door." *Id*. at 2:34.

At this point in the audio the dispatcher cut back in discussing the situation: "I've got him on the line, he's sitting here telling this, there's a female there, he's like 'the po-po is on the way, don't open, be opening the door for these fuckers." *Id*. at 2:36–2:42.  The dispatcher then responded to an unknown prompt, indicating, "Yes, he called and he set the phone down," *id*. at 2:43–2:44, and then she went on to explain how the situation began.  Meanwhile, voices can be heard on Surgeson's end of the phone.

At just under three minutes into the audio recording, Surgeson said to someone, "Go upstairs and shut up."  A woman responded, "No." *Id*. at 2:53.  The dispatcher stopped talking, presumably because she picked back up on Surgeson's conversation.  Surgeson said, "I'm goin down to the basement.  Yep.  Yep, fucking right I am.  Po-po's are on their way, big time.  Big time." *Id*. at 2:56–3:05.  Someone added, "Grab a coat!" *id*. at 3:05, and Surgeson said, "Yep," then "Don't, don't turn the T.V. on.  [inaudible] turn that T.V. off," *id*. at 3:06–3:11.  Then he

---

[3] Again, the identity of the woman on Surgeson's end of the phone call, whether it be Kish, Teaira, or someone else, has not been made known by the parties.

said, "Turn the light on, and fucking, serious.  Serious.  I'm serious.  Jesus . . . Christ."  *Id*. at 3:14–3:20.  Surgeson continued to speak, saying things like, "They're fucking on their way, bitch," *id*. at  3:23–3:24, and "all the doors are locked," *id*. at 3:25.  The unidentified woman said, "You're acting stupid, man," *id*. at 3:35–3:36, and Surgeson responded, "I know I am," *id*. at 3:37.  He then continued to speak, but his words are indecipherable.

The dispatcher cut back in at this point and continued to summarize the conversation with whomever she was speaking with: "He's walking around, he's telling her to go upstairs and be quiet, he's going in the basement, he's locking the door, he's not letting them in.  And he just keeps repeating 'The po-po are on their way, the po-po are on their way, they're all coming, they're all coming.'  I have no clue what he is doing or up to, and the female keeps talking but it's not like a fight, but he[4] sounds very distraught."  *Id*. at 3:40–4:04.  Silence ensued for about twenty seconds, at which point it sounds as if someone picked up the phone.  The dispatcher twice said, "Hello," *id*. at 4:26–4:27, but there was no response.  After approximately two minutes, during which time nothing was said, the dispatcher announced, "I still have an open line and I can't hear anything now.  Nobody's talking now."  *Id*. at 6:13–6:17.  At six-and-a-half minutes into the recording, "There's no talking at all."  Despite the silence, the operator stayed with the call.

## B

While these events were taking place, Kish, Teaira, and Maurice were taking action. Maurice called Leslie and indicated "that she needed to come home because there was an event, situation going on at the house.  [Surgeson] was acting crazy."  Brown Dep. 122.  Leslie relayed

---

[4] Notably, the Defendant Officers contend they were told the female on Surgeson's end of the line was distraught, rather than Surgeson.  *See* Kamp Aff. ¶ 9; Lewis Aff. ¶ 9; Richnak Aff. ¶ 9, *all attached as* Defs.' Mot. Ex. B. However, the audio reflects that Surgeson was talking to a woman, that it was not a fight, and that "*he* sounds very distraught."  911 Audio 4:02–4:04 (emphasis added).

to Brown that Surgeson was drunk and "acting crazy," and so the two women decided to collect Leslie's nephew and start back toward 305 Marsac. *Id*. Brown's daughters also spoke with Leslie and said that they were "going to leave and take a walk" until the two women returned to address Surgeson. *Id*. at 115–16.

On the way back to 305 Marsac, Brown received information concerning her oldest daughter, who was in the hospital at the time experiencing problems with her pregnancy. *Id*. at 116. So Brown planned to drop Leslie off at the home to deal with Surgeson and then continue on to the hospital to see her oldest daughter.

## C

Returning to the audio recording of Surgeson's 911 call; around eight-and-a-half minutes into the recording, Surgeson said: "Damn, why's it so dark in there?  Is everybody scared?  Who made a mess in here?  Is everybody scared?"  911 Audio 8:30–8:46.  The dispatcher relayed these comments. *Id*. at 8:52–8:55.

Surgeson can be heard again approximately thirty seconds later.  He repeated some person's name over and over (the name is difficult to discern, but presumably it is "Reece," referring to Leslie's son Maurice), and finally concluded, "Will you give me a ride, brother?" *Id*. at 9:35–9:54.  A male responded, but his words are too low to make out.  Presumably Maurice, the male then said, "My mom is coming." *Id*. at 10:03.  Surgeson responded, "Just over by the church, man." *Id*. at 10:05.  Maurice repeated, "My mom's coming right now."  Surgeson: "Can she give me a ride?"  Maurice: "Yea."  Surgeson: "You sure your mom's coming?"  Maurice: "Yea, go unlock the back door."  Surgeson: "What, unlock the back door?"  Maurice: "Yea, unlock the back door for my friend."  Surgeson: "The police are here."  Maurice: "No they're not!"  Surgeson, almost to himself: "They're gone.  I'm not answerin' no fucking door for

nobody.  I am not answerin' no door."  Maurice: "Ain't no police here, man."  Surgeson: "No, I'm not here.  If the police, if they bust in here, I'm not here."  *Id*. at 10:06–10:50.

Surgeson and Maurice (again, presumably; the parties did not take the time to identify the speakers) then engaged in small-talk, with statements such as "Don't fucking tell me the police are here, man," *id*. at 11:24, mention of one "crazy Eddie," *id*. at 11:31, "What the fuck you fucking with me for?  You gotta cigarette?" *id*. at 11:39, and "What the fuck you tell me the police are here for?  Fucking asshole," *id*. at 11:43–11:45.  The dispatcher then relayed that Surgeson and "a younger guy" were talking, including the mention of "crazy Eddie."  *Id*. at 12:02, 12:09.  Surgeson broke back in: "I need a ride."  *Id*. at 12:26.  The dispatcher: "Oh now he keeps saying he needs a ride."  *Id*. at 12:27–12:28.  Surgeson again: "I need a ride, Reece."  *Id*. at 12:50.

Then Surgeson said something interesting: "I need a ride.  I'm gonna kill that bitch."  *Id*. at 13:22–13:24.  The dispatcher mumbled "uh," but she did not relay what she had heard at that point.  Police chatter is then audible but indiscernible, after which the dispatcher discussed the "Johnny Mae thing," apparently because Surgeson was referring to a former Bay City narcotics officer.  *See* Defs.' Mot. 2.

At this point Leslie had returned home, and she and Surgeson can be heard arguing: Surgeson: "Leslie, you can kick me out, I don't care."  Leslie: "You're calling them kids bitches and shit, man.  I was on the phone!"  Surgeson: "They are fucking bitches."  Leslie: "So you, that's, you don't call 'em bitches.  I was on the phone when you were callin them bitches."  Surgeson: "Mother fucking retards."  Leslie: "You are, Bob."  Surgeson: "I know."  Leslie: "Allright.  Okay."  911 Audio at 15:24–15:46.  Surgeson said a few other things, which are indiscernible, before he called out: "Leslie will you come talk to me for a minute?"  Leslie: "No

Bob."  Surgeson: "Why?"  Leslie: "Because you're drunk."  Surgeson: "Well, like, please?"  Leslie: "No Bob."  *Id*. at 16:14–16:20.  Although Leslie continued talking, and the tenor was that she did not want to talk to Surgeson while he was intoxicated, her exact words are impossible to understand.  Surgeson: "I'm gonna leave."  *Id*. at 16:25.  Leslie: "Whatever, Bob."  *Id*. at 16:28.  Surgeson: "Sis, you gotta come talk to me."  *Id*. at 16:35.  No response.  The dispatcher: "It sounds like I've got three people now.  The caller is going to be the older male."  *Id*. at 16:57–17:06.  Surgeson to an unknown: "Can you drop me off just now, on your way? [inaudible]."  *Id*. at 17:10–17:17.

Twenty seconds later a child's voice enters the audio.  The dispatcher: "Now I think I can hear a small child.  Way, way in the background."  *Id*. at 17:39–17:44.  Surgeson cut back in: "Leslie."  Leslie: "What?"  Surgeson: "Can you borrow me a couple dollars?  Come here, Lez.  Come here, hun."  *Id*. at 17:49–18:00.  The little child can be heard scampering around, and Surgeson seemingly called, "Phoebe!" or some other name.  *Id*. at 18:08.  While the dispatcher talked to an unknown party, Surgeson talked to the child in the background.  *Id*. at 18:22–19:58.  Most of his words cannot be made out, but he did say "Uncle Bob," *id*. at 19:33, "I love ya," *id*. at 19:37, and "Uncle Bob loves you," *id*. at 19:39–19:40.

It seems as though Surgeson said something to the child that Leslie did not approve of.  She yelled, "Bob!  Don't be saying stupid ass shit to him like that."  *Id*. at 19:59–20:02.  Surgeson: "What'd I do?"  Leslie: "Well why did you say that to him?  To hurt his [inaudible], to hurt his feelings."  Surgeson: "Don't get mad at me."  Leslie: "Well then don't talk stupid.  You tell him you love him and that's all you gotta say."  *Id*. at 20:06–20:19.  Leslie then continued to berate Surgeson, although her exact words—and his responses—remain unclear.

**D**

The audio recording then cuts to police chatter between the responding officers and a male dispatcher, including a timestamp whenever a new party makes a comment. The conversation begins with the male dispatcher explaining the ongoing circumstances at Surgeson's location: "Okay, I wasn't sure how many you'd want on this. 305 Marsac. Three zero five Marsac. Crossroads are 22nd and Lafayette. Had a male subject call in, stated there was a bump and grind going on, would not elaborate as to what that was, just said 'send the police,' has now set the phone down so we have an open line. Can hear him talking to a female, telling her 'go upstairs, don't open the door, the police are on the way.' Still have an open line, not sure what's going on." *Id*. at 21:15–21:48. Another man responded, "Okay, yea, send two-eighty as well." *Id*. at 21:50. After the male dispatcher sent "280" to 305 Marsac, an officer said, "two-sixty five to, uh, to the other responding units, let's meet up, um, let's meet up on water street in front of the electric department quick, we'll coordinate." *Id*. at 22:26–22:36. At least one officer responded, "Okay."

The male dispatcher comes back into the audio around twenty-three minutes in. He said, "[inaudible] en route to Marsac, we still have an open line. The last couple of minutes haven't been able to hear any talking." *Id*. at 22:54–23:00. An officer: "Is it a cellphone or a landline?" The dispatcher: "It's a landline. The last thing he stated was he was going to the basement and locking all the doors and told the female to go upstairs and be quiet. Since then no talking." *Id*. at 23:13–23:36. Over the next few minutes, the officers asked for various updates, and the male dispatcher relayed what was outlined above: Surgeson asking why it was dark, and then requesting a ride, and making a "comment" about "kill[ing] that 'bad, uh, female word'." *Id*. at 25:27. Then the dispatcher said, "Just to let you know, too, he did bring up 61 from your

- 8 -

department a couple of different times, asking if he was there.  Just general conversation about him."  Another officer responded, "Wanting to know if he was coming, you mean?"  The dispatcher: "[inaudible] somebody asked if he was there."  *Id*. at 25:43–26:01.  Importantly, at no point in the audio did the male dispatcher relay anything about a female in distress.

### E

Another officer, Jeffrey Ross,[5] cuts into the audio shortly after twenty-six minutes in.  "I'm in an unmarked, we got a car leaving [305 Marsac] right now."  *Id*. at 26:19–26:22.  The male dispatcher responded, "okay, copy that, a vehicle leaving that address."  *Id*. at 26:26–26:28.  Another officer then said, "[inaudible] if you wanna follow them we'll roll that car just call it out before we approach."  *Id*. at 26:32–26:34.  Officer Ross: "It's, uh, east on 22nd."  *Id*. at 26:39.  The other officer: "What kind of car is it?"  *Id*. at 26:44.  Officer Ross: "Silver, I'll try and catch up to it.  She just turned, I think we're right behind you."  *Id*. at 26:47–26:58.  Some chatter follows, but it is difficult to make out precisely what passed between the officers.  Officer Ross then cut back in and indicated that although he had previously said the car was southbound, it was in fact northbound.  *Id*. at 27:34–27:40.  Another officer: "We're going to stop that car right in front of the BP here."  *Id*. at 27:54–27:59.

Over the next few minutes, the audio involves various individuals asking if there was any more information, or any activity, at 305 Marsac.  The female dispatcher indicated that she could hear people talking but could not make out their exact words.  *Id*. at 28:28.  At thirty minutes into the audio, the male dispatcher indicates, "Negative.  The only thing we're hearing now is an older female talking and what sounds like a smaller child. . . .  The original caller was, sounded like an older male, we have not heard him for quite some time."  *Id*. at 30:08–30:30.

---

[5] Officer Ross was conducting surveillance at other addresses in Bay City when he heard about Surgeson's call from central dispatch.  Ross Dep. 11–12, *attached as* Defs.' Mot. Ex. C.  He then proceeded to 305 Marsac and observed the location "for three to four minutes" from an unmarked vehicle.  *Id*. at 17.

A male voice cuts into the audio thirty seconds later, but whether it was an officer or the male dispatcher is unclear.  He said, "two-eighty four to the other units, it's probably gonna be Robert Surgeson in there."  *Id.* at 30:53–30:57.  Another officer responded, "Did he say there's a problem in there, Nate?"  *Id.* at 31:11–31:13.  Some other officer asked: "Hey are they indicating if there's any type of problem over here or are you not getting much help from them?"  *Id.* at 31:31–31:35.  The response from the first voice: "According to her, no."  *Id.* at 31:41.

At that point, the officers were able to initiate contact using Brown's cellphone to call Leslie.  One indicated over the radio, "Okay, we're having difficulty communicating, there's four residents inside the house, two kids, her, and Robert since he's set the phone down and walked away."  *Id.* at 32:25–32:34.  Another officer then said, "Hey, Nate, incoming.  We made contact with some residents . . . I guess just Bob is just extremely intoxicated tonight."  *Id.* at 32:37–32:43.  Eventually, the officers indicated that the "house [was] clear," *id.* at 34:00, and that they had no reason to "hold" Surgeson, *id.* at 36:38.  Someone did request that the officers administer a "PBT," *id.* at 36:53, otherwise known as a preliminary breath test.

Surgeson returns to the scene in the thirty-eighth minute: "Hey I'm not drunk, I'm fucking dealing with people that fucking, I don't care what you do.  Whatchya gonna do take me to jail?"  *Id.* at 37:18–37:28.  An officer explained that, basically, Surgeson's response to taking a PBT was "No."  *Id.* at 37:35.  Another individual, "Yea we gathered that.  Thanks."  *Id.* at 37:40–37:42.  Because Surgeson was on parole at the time, the officers then discussed contacting his parole officer, although they viewed the prospect dubiously given that it was 9:30 in the evening.  *Id.* at 38:00–38:30.  Another voice: "39 disregard that, just write it up."  *Id.* at 38:37–38:39.  After a few minutes of additional chatter, all seemingly irrelevant, the audio recording ends.

**F**

As explained earlier, after leaving their friends house, Brown and Leslie made their way to the 305 Marsac residence. Brown parked in the driveway next to the house, near the backdoor. Brown Dep. 124–25. After dropping Leslie off, and carrying her nephew inside, Brown immediately left the location (which Officer Ross reported to Central Dispatch). She was on her way to the hospital to see her daughter. *Id*. at 127.

Although it is difficult to understand exactly when Brown was stopped in relation to the events described above, from the audio it seems as if the officers did not pull her over until after children could be heard in Surgeon's location, and after Leslie had arrived and indicated he was intoxicated. Indeed, it was long after the dispatcher had informed officers that she could hear talking, but importantly, that it did not seem to be an altercation. *See* 911 Audio 3:40–4:04. Nevertheless, once Officer Ross reported Brown's departure from the 305 Marsac residence in her car, the responding units followed her as noted and pulled her over in the parking lot of a BP gas station. The events that followed led to this lawsuit.

At first, Brown thought there was a "high-speed chase" going on because she saw an unmarked vehicle (Officer Ross's) being followed by two police trucks. Brown Dep. 131. She saw the cars making u-turns and thought, "oh, somebody in trouble," so she pulled "out of the way into BP's parking lot with no idea" that she was the police's intended target. *Id*. Eventually, according to Brown, four police vehicles pulled into the BP parking lot behind her and Bay City officers "swarmed" her car. *Id*. at 134–35.

Brown testified that it all happened very fast, but the first thing she noticed was that one of the officers opened the back passenger door of her car and pointed a long rifle "in at [her] head." *Id*. at 145, 147. "All [Brown] could see was the gun." *Id*. at 148. According to Brown,

the officer "told [her] to shut up and put [her] hands up." *Id*. Brown claims she was asking the officers what was going on, that she was "screaming at the top of [her] lungs, 'what's going on, what did I do?'" *Id*. at 150. She says the officers did not tell her anything aside from yelling at her to "shut the F up." *Id*. at 149. Brown remembers her car being surrounded by six officers, all carrying "long guns." *Id*. at 151.

The next thing Brown knew, one of the officers opened her driver's side door and "they were saying to get out." *Id*. at 153. She put "one foot" out of the car when two officers "grabbed" her by her shirt and "just threw [her]." *Id*. at 155, 157. The next thing she knew she "was on the ground." *Id*. at 156. Brown claims that she was thrown "far" by her "shoulders." *Id*. at 157. Then one of the officers put his knees into Brown's back, and she was eventually handcuffed. *Id*. at 158–59. Although Brown continued to ask what she had done, the officers insisted that she "shut up" while they pointed their guns directly "at [her] head." *Id*. at 158–59, 160. According to Brown, the officers then picked her up off of the ground and patted her down. *Id*. at 166–67.

Then, while she was still handcuffed, the officers began asking her questions about 305 Marsac. Brown indicated that she had just dropped Leslie off at that location, but still "didn't know anything was going on with [Surgeon] or anybody" so she "did not tell them nothing about [Surgeon] at that time." *Id*. at 170. The officers then helped Brown use her cellphone, still cuffed, to call Leslie. *Id*. at 171. While the officers were on the phone with Leslie, they did not ask Brown any questions, and she did not offer up any additional information. *Id*. at 172. Once the officers were done speaking with Leslie, they released Brown. *Id*. at 178. The entire event lasted less than ten minutes.

**G**

Although the Defendants' summary judgment motion must be decided "on facts taken in the light most favorable" to Brown, *see Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008), the officers' version is not distinctly different from Brown's in many respects.  Three officers involved in stopping Brown's car at the BP gas station are defendants in this case: Bradley Lewis, Nathaniel Kamp, and Jason Richnak.  During the incident, Kamp and Lewis were riding in the same patrol car, while Richnak was in his own cruiser.  Richnak Dep. 30, 34–35, *attached as* Defs.' Mot. Ex. F.  Kamp indicated in his deposition that the officers "made the decision to stop [Brown's] vehicle based on the fact that there could have been a violent assault inside the house or a hostage inside the vehicle and also stopping the vehicle would—leads to intelligence to allow us to know what's going on inside the residence."  Kamp Dep. 31–32, *attached as* Defs.' Mot. Ex. D.

According to all involved, Lewis, Kamp, and Richnak approached and surrounded Brown's car, and all three officers eventually ended up at Brown's driver's side door.  *Id.* at 33–34; Richnak Dep. 41.  Kamp was armed with "[a]n AR-15," in the "high-ready position"—in other words, aimed directly at Brown.  Kamp Dep. 37.  Lewis and Richnak also indicated they had their firearms drawn and ready; Lewis indicating that his was pointed directly at Brown.  Lewis Dep. 22, 27, *attached as* Defs.' Mot. Ex. E; Richnak Dep. 39.

As the officers approached Brown's car, not one of them saw any weapons, either on Brown or in her vehicle, nor did they see anything that gave them "concerns about gang issues."  Kamp Dep. 38; *see also* Lewis Dep. 28; Richnak Dep. 42.  Although Kamp could not recall exactly who spoke, "commands were given," and Brown was told to put her hands in the air.  Kamp Dep. 40.  Kamp could see Brown's hands "clearly" the whole time, and he could see into

- 13 -

her car; she was the only person he noticed. *Id*. at 42, 43. Lewis testified that he, too, could see Brown's hands while she was in her vehicle. Lewis Dep. 23. Likewise, Richnak testified that Brown "was in the driver's seat with her hands up." Richnak Dep. 42.

Although the Officers' version of events diverges from Brown's at this point—and thus cannot be credited for purposes of their motion or qualified immunity—Officer Richnak testified that Brown was noticeably "[e]xcited" and "upset," but nevertheless was "very decent." Richnak Dep. 44, 52. Officer Kamp testified that Brown did not make any verbal threats and "complied with the orders" she was given. Kamp Dep. 38, 44. Officer Lewis testified that the manner in which Brown complied with his orders gave him no concerns "whatsoever." Lewis Dep. 25.

## H

On September 28, 2012, Brown filed a complaint against Lewis, Kamp, Richnak, Dispatcher #1, and the City of Bay City. In the five-count complaint, Brown alleges that these Defendants violated her fourth amendment rights to be free from unreasonable seizures (Count I), false arrests (Count II), and excessive force (Count III). Brown also alleges a state law claim for assault and battery (Count IV) and a claim for exemplary damages (Count V). Currently pending is the Defendants' motion for summary judgment, filed November 4, 2013.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

<div align="center">

**III**

</div>

Two of the counts in Brown's complaint assert claims against the Defendant Officers for violations of her constitutional rights. Although not expressly stated in the complaint, Brown advances these claims under 42 U.S.C. § 1983.

To state a claim pursuant to § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). Brown, the plaintiff here, must also overcome the defense of qualified immunity, which shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining whether a law enforcement officer is shielded from civil liability due to qualified immunity, courts typically employ a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). A right is "clearly established" for qualified immunity purposes when the contours of the right are sufficiently

clear, even if the specific action in question has never been held unlawful.  *Smoak*, 460 F.3d at 778 (citation omitted).  Accordingly, the relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. (quoting *Katz*, 533 U.S. at 202).

Throughout the analysis, the burden is on Brown to show that the Officers are not entitled to qualified immunity.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.").

Brown's complaint alleges that the Defendant Officers violated her right to be free from unreasonable seizures and excessive force.  Each claim is addressed below.

**A**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  These safeguards of the Fourth Amendment, "with respect to police/citizen contact, vest only after [a] citizen has been seized."  *United States v. Richardson*, 949 F.2d 851, 855 (6th Cir. 1991).  A seizure occurs where, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that police officers are permitted to conduct a limited seizure—the "investigatory stop"—in the absence of probable cause:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and

> makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment.

*Id.* at 30–31; *see also id.* at 27 (holding that a police officer may conduct a cursory "stop and frisk" of a suspect if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"). The Court in *Terry* struck a balance between the "public interest and the individual's right to personal security," *United States v. Brignoni–Ponce*, 422 U.S. 873, 878 (1984), and determined that an investigatory stop is permissible if supported by an officer's "reasonable suspicion" that criminal activity is afoot, *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In assessing reasonable suspicion, courts are to look to the "totality of circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Jacob*, 377 F.3d 573, 577 (6th Cir. 2004). "If police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). The circumstances can include information "derived from such sources as informant tips, dispatch information, and directions from other officers." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). However, the report itself must have "been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense." *Hensley*, 469 U.S. at 232.

In determining the reasonableness of a *Terry* stop, the degree of the Defendant Officers' suspicion is only one aspect of the inquiry: "The manner in which the seizure and search were

- 17 -

conducted is, of course, as vital a part of the inquiry as whether they were warranted at all."
*Terry*, 392 U.S. at 28.  Moreover, "[t]he scope of activities during an investigatory stop must
reasonably be related to the circumstances that initially justified the stop."  *Richardson*, 949 F.2d
at 856.  If an investigatory stop is conducted in an unreasonable way, the seizure then ripens into
an arrest, which must be supported by probable cause.  *United States v. Hardnett*, 804 F.2d 353,
356–57 (6th Cir. 1986) (holding that because "the use of arms was reasonably necessary under
the circumstances," the investigative stop was not converted into an arrest).

> The reasonableness of a stop is thus determined by two factors:
>
> (1) whether there was a proper basis for the stop, which is judged by examining
> whether the law enforcement officials were aware of specific and articulable facts
> which gave rise to a reasonable suspicion; and (2) whether the degree of intrusion
> into the suspect's personal security was reasonably related in scope to the
> situation at hand, which is judged by examining the reasonableness of the
> officials' conduct given their suspicions and the surrounding circumstances.

*Smoak*, 460 F.3d at 779 (citation omitted).  In other words, "the greater the degree of intrusion
during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty
of wrongdoing."  *Id*.

## 1

Noted above, reasonable suspicion need not arise from an officer's direct observation, but
can be based on dispatcher information and observations of other officers.  *Id*; *see also United
States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) ("A law enforcement officer is generally
justified in stopping an individual and asking for identification when relying on information
transmitted by a valid police bulletin.").  In this case, Kamp, Lewis, and Richnak relied on radio
traffic indicating there was a 911 call from 305 Marsac and that a vehicle had pulled away from
that location.

Based on the totality of the circumstances, the dispatchers on whom the Officers relied had a reasonable suspicion that some mishap had occurred. Surgeson made clear that he was locking all the doors and would not let any officers enter, although he clearly believed they were on their way. He ordered others to go upstairs and to "be quiet," stated he was going to "hide," and even at one point commented that he was going to "kill the bitch." These statements—although simply the ramblings of a drunk when viewed in context—would put law enforcement on alert of a possible crime. Because Surgeson continuously stated that he then needed a ride, it was also reasonable for the Officers to suspect that it was Surgeson himself in the car that Officer Ross saw pull away from the 305 Marsac residence. Thus, Officers Kamp, Lewis, and Richnak had a reasonable suspicion sufficient to conduct a *Terry* stop.

### 2

However, the manner in which the stop occurred—as recalled by Brown—went beyond that suspicion. "When police actions go beyond checking out the suspicious circumstances that led to the original *Terry* stop, the detention becomes an arrest that must be supported by probable cause." *Smoak*, 460 F.3d at 780–81 (brackets omitted) (quoting *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994)). Courts consider the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is "reasonably related to the basis for the original intrusion." *Houston v. Clark Cnty. Sherriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999).

The events according to Brown are as follows: her car was swarmed by officers armed to the teeth, with numerous guns pointed directly at her head. She was ordered out of her car, and when she moved to comply, she was grabbed by two officers and thrown to the ground. One of the officers then kneeled on the small of her back, while others still had guns trained on her head,

and handcuffed her.  All the while the Officers responded to her questions and pleas by telling her to "shut up" and "be quiet."

Although the use of guns and handcuffs do not automatically transform a *Terry* stop into an arrest, "these displays of force must be warranted by the circumstances."  *Smoak*, 460 F.3d at 781 (citation omitted).  If Brown's version of the events is appropriately credited, the circumstances here did not warrant the Officers' use of force.

Simply put, accepting Brown's version of the events as true, the Officers overreacted. All they knew from the dispatcher was that something odd was going on at 305 Marsac; she never once mentioned any potential crimes.  Indeed, what the dispatcher relayed to other officers was that she had "no clue what [Surgeson] is doing or up to . . . it's not like a fight . . . ."  911 Audio 3:40–4:04.  So while stopping a vehicle leaving the location to find out what was going on was reasonable, and the use of guns may have been initially warranted for officer protection, there was no need to continue once the Officers saw that there were no weapons or hostages in Brown's vehicle and they could see her hands in plain view.  If Brown is appropriately credited, pulling her from the car, throwing her to the ground, and then handcuffing her was not warranted either.  In balancing the Officers' suspicion—based on an unsubstantiated dispatch alerting the Officers to an odd situation—against the intrusiveness of the seizure, the Officers violated Brown's Fourth Amendment rights because the seizure of her person was an arrest without probable cause.  *See Smoak*, 460 F.3d at 782 (indicating that seizure was an arrest, not a simple *Terry* stop, where the officers' use of handcuffs, loaded weapons, and detainment in cruisers was not warranted by the suspicion of a possible robbery).

**3**

Although, when considering the facts most favorably to Brown, it has been established that Officers Kamp, Lewis, and Richnak violated her Fourth Amendment right against unreasonable seizures, it still must be determined whether the Officers are entitled to qualified immunity.  Upon review, the Officers are not so entitled.

Again, determining whether qualified immunity applies to officer conduct involves a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter*, 408 F.3d at 310–11.  Noted above, with the facts in her favor, the Officers violated Brown's Fourth Amendment rights; all that remains to determine is whether her rights were "clearly established."

*Smoak* resolves the question.  In highly similar circumstances—where police officers used loaded weapons and handcuffs to secure individuals based only on the unsupported tip of a possible robbery—the Sixth Circuit indicated that the detained individual's rights had been violated.  *See Smoak*, 460 F.3d at 782.  The court held, however, that "[a]lthough the use of guns and handcuffs in the present case was unreasonably intrusive, prior decisions had not made this clear."  *Id*.  *Smoak*, decided in 2006, thus made it clear that the unreasonable use of guns and handcuffs will not be condoned by the Constitution.  So, at the time of Brown's seizure, it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 778 (quoting *Katz*, 533 U.S. at 202).  Accordingly, the Officers are not entitled to qualified immunity on Brown's unlawful seizure claim.

**B**

The Supreme Court has established that the right to be free from excessive force during an arrest or investigatory stop exists as part of the Fourth Amendment's protection against unreasonable seizures.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989).  Accordingly, taking Brown's allegations as true, she has properly alleged a Fourth Amendment deprivation for excessive force as well as unreasonable seizure.

In assessing excessive force cases under the Fourth Amendment, courts are to "apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants."  *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citation omitted).  Like the unreasonable-seizure analysis, this Court is to balance "the nature and quality of the intrusion on a plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. (brackets omitted) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006)).  In doing so, three factors guide the analysis: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *Burgess*, 735 F.3d at 472–73 (brackets and internal quotation marks omitted).  "These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight."  *Id*. at 473.

Here, based on the facts as alleged by Brown, the Officers applied excessive force. Indeed, the Officers acknowledge that Brown was fully compliant with every one of their orders; they observed no weapons or hostages in her car, and her hands were in clear view throughout

- 22 -

the encounter.  Accordingly, pulling Brown from her car by force and then roughly placing her on the ground was not a reasonable way to restrain her; particularly in a case where the police knew of no crimes that had been committed.

Although it is not clear from Brown's allegations which two officers grabbed her from her car and forced her to the ground, all three officers can still be liable under § 1983.  In *Durham v. Nu'Man*, 97 F.3d 862 (6th Cir. 1996), the Sixth Circuit established that "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff." *Id*. at 866.  Indeed, in *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) (per curiam), the Sixth Circuit established as follows: "We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Id*. at 426 (citation omitted).  Because there is a genuine dispute of material fact as to which officers grabbed and threw Brown (at least according to her version of events), summary judgment is not warranted as to any of them.

Qualified immunity does not shield the Officers' conduct here because it is well-established that the use of violent, physical force against a suspect who is compliant and poses no danger to herself or others is excessive.  *See Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009); *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009) ("The general consensus among our cases is that officers cannot use force . . . on a detainee who . . . is not resisting arrest.").

## IV

Brown also alleges two state law claims against the Officers—for false arrest and assault and battery.  Of course, governmental employees are immune from liability for intentional torts

pursuant to the Governmental Tort Liability Act. *See* Mich. Comp. Laws § 691.1407(2). To obtain this protection, a governmental employee must raise governmental immunity as an affirmative defense and establish three factors: "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 218 (Mich. 2008).

As noted by the Officers in their motion, "there is no dispute that [they] . . . were performing discretionary acts when they stopped [Brown's] vehicle and detained [her]." Defs.' Mot. 29. The Officers have not demonstrated, however, that they "reasonably believed" they were acting "within the scope of their authority" when they arrested Brown without probable cause and when they grabbed her out of her car and threw her to the ground. Indeed, based upon Brown's version of events, the Officers were undoubtedly *not* acting within the scope of their authority.

Under Michigan law, a false arrest "is an illegal or unjustified arrest." *Lews v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 894 (Mich. 1982). To establish liability for false arrest, "the plaintiff has the burden of proving that the arrest was not legal, i.e., that it was made without probable cause." *Small v. Chirco*, No. 311728, 2014 WL 129278, at *1 (Mich. Ct. App. Jan. 14, 2014). Because Brown's seizure, as she alleges it occurred, rose to an arrest without probable cause, summary judgment is not warranted on this claim.

Nor is summary judgment appropriate on Brown's assault and battery claim. To recover civil damages for assault under Michigan law, a citizen must demonstrate an "intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward

the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. 2004) (citation omitted).  To recover for battery, a plaintiff must demonstrate a "willful and harmful or offensive touching of another person which results from an act intended to cause such a contact."  *Id*.  And when these claims are alleged against a police officer—as they are here—the plaintiff must also demonstrate that "the officers' actions were not justified because they were not objectively reasonable under the circumstances."  *Id*.  Here, Brown has alleged that she had loaded assault rifles shoved in her face and was then grabbed and thrown to the ground during the course of her arrest.  There is, at the very least, a genuine issue of material fact as to whether the Officers' actions were reasonable.

Accordingly, the Officers have not sufficiently demonstrated that governmental immunity shields them from liability for these state law intentional torts.  Summary judgment is not warranted on these claims.[6]

## V

In her complaint, Brown also alleges claims against the City of Bay City.  However, this Defendant does not belong in this case, and it will be dismissed.  In fact, in her response, Brown acknowledges that the City of Bay City was listed as a defendant during "an editing error and [she] has no objection to an order dismissing the City . . . as a Defendant . . . ."  Pl.'s Resp. 27.  Accordingly, all claims against the City of Bay City are dismissed.

---

[6] Defendants' motion for summary judgment does not address Count V of Brown's complaint, presumably because if the other claims were dismissed there could be no claim for exemplary damages.  But, because the claim is not addressed, it will not be dismissed.

## VI

Accordingly, it is **ORDERED** that the Defendants' motion for summary judgment, ECF No. 18, is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that Brown's claims against the City of Bay City are **DISMISSED** with prejudice.

Dated: January 31, 2014                              s/Thomas L. Ludington
                                                     THOMAS L. LUDINGTON
                                                     United States District Judge

<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 31, 2014.

                              s/Tracy A. Jacobs
                              TRACY A. JACOBS

</div>